CELLULOID MANUF'G Co. *v.* CROFUT and others.

*(Circuit Court, D. New Jersey.* August 26, 1885.)

1. PATENTS FOR INVENTIONS—ANTICIPATION—PATENT No. 65,267.
   Patent No. 65,267, dated May 28, 1867, and granted to William Hugh Pierson, for an improved plastic material made from vegetable fibers, was not anticipated by the English letters patent, granted to Alexander Parkes, upon a specification enrolled in the British office, on April 17, 1856.

2. SAME—ABANDONMENT—POVERTY—SICKNESS—INSANITY.
   Continued poverty, sickness, and mental alienation are sufficient excuses for delay in procuring a patent. Abandonment to public *held* not shown.

In Equity.

*Dickerson & Dickerson,* for complainant.

*John P. Adams,* for defendants.

NIXON, J. This action is brought against the defendants to recover damages for the infringement of letters patent No. 65,267, dated May 28, 1867, and granted to William Hugh Pierson for an "Improved Plastic Compound," made from vegetable fibers. The patent relates to what is called by the patentee the "Plastic Art," and especially to the production of celluloid. He takes some form of fibrous material known as "cellulose," as, for instance, the ordinary cotton fiber, and converts it into nitro-cellulose, by treating it with nitric, or a mixture of nitric and sulphuric acids. By the action of these acids the cellulose is turned into a material usually called pyroxyline. This pyroxyline is then submitted to the action of solvents, which may be a mixture of alcohol and ether, or wood spirits, sufficient in quantity to put it into a half-dissolved or pulpy, but not into a liquid, state. The action of the solvents makes a plastic mass which is capable of being moulded into desired forms. To produce different effects, different foreign substances are added; and to render the result suitable for manufacture, it is laid upon a proper surface and submitted to continued pressure, by which it is compacted into a solid mass, now known as celluloid.

The complainant insists that the defendants have infringed the first and second claims of the patent, which are as follows: (1) The formation of articles of manufacture resembling stone, wood, whalebone, shell, horn, and other rigid or elastic articles out of celluloid, or semi-soluble pyroxyline, prepared substantially in the manner and for the purposes herein set forth. (2) The combination of plastic, as above described, with vegetable or any other foreign matter, substantially in the manner and for the purpose set forth.

Numerous defenses are set up in the answer, but two only were urged at the hearing:   (1) That Pierson was not the original and first inventor; the patent having been anticipated by the English letters patent granted to Alexander Parkes upon a specification enrolled in the British office on April 17, 1856.   (2) Abandonment of the invention to the public.

1. The invention claimed by Pierson is undoubtedly fully set forth by Parkes in the second part of his specifications relating to the use of solutions of gun-cotton, or other similar compounds.   But this is a foreign patent, and the complainant meets the alleged anticipation by evidence tending to show that the actual invention of Pierson was made by him some years previous to the sealing of the Parkes patent.   Has he been successful in the attempt?   The testimony is explicit and mainly uncontradicted that as early as the year 1850 the patentee, Pierson, began to direct his thoughts and devote much of his time to the production of solid bodies from pyroxyline and solvents; and combinations therewith of other materials.   He was then a young physician, practicing his profession in Cincinnati.   He made such experiments as his limited means allowed from 1850 to the month of July, 1855, when he was compelled by his pecuniary necessities to leave Cincinnati and take refuge for support in his father's house at Orange, in the state of New Jersey.   He endeavored to enlist the interest and sympathy of the father in his invention, but he seems to have been of a practical turn of mind, and instead of encouraging, tried to check the son from indulging in such profitless hallucinations.   The patentee was a witness in the case, and his modest story of his perplexities and struggles with poverty is quite pathetic.

"My practice as a physician," he says, "was very small in amount, and was among the poor, and I think I could not have collected as such as 50 cents a day.   I did not collect enough to meet my mere living expenses.   I had to receive aid from my father to meet those expenses.   When Mr. Price, with whom I boarded, left Cincinnati, I was in his debt in about the sum of $150. My recollection is that I had agreed to pay him at the rate of about ten dollars per week for my board.   This sum of $150, so due, my father afterwards paid for me, and I was unable for years thereafter to collect sufficient money from my earnings to liquidate that account.   After Mr. Price left Cincinnati in the year 1853, I was reduced to very great straits at times, and lived the best way I could, from hand to mouth, in my own room, a large part of the time on bread and water.   During all this period, however, I constantly devoted all the money that I could in any way spare, and really more than I could properly spare, from my actual necessities, to the purchase of materials for carrying on my experiments and completing my invention.   I was necessarily greatly hampered in my work from lack of means, but I persistently employed all the means in my power, and constantly devoted all the time and attention I could spare from limited practice, to the perfection of what I at that time and ever since have believed would prove to be an invention of the greatest value to mankind and possibly to myself.   *   *   *   I was finally compelled to leave Cincinnati, and returned to my father's house in Orange, in the state of New Jersey, where, at least, I was assured of having enough to eat.   I went right to work, continuing my experiments to improve and per-

fect the invention. I conducted them at first in a corn-crib on my father's premises, and afterwards in Willow Hall, which my father had just built. I moved into Willow Hall in September, 1855. After I arrived in Orange, and prior to my moving to Willow Hall, I had made other solid pieces of the material which I called plastic, and had also coated cloths. After moving into Willow Hall, I worked to perfect my invention; to adapt it to different uses, and to get it into a state in which I could obtain the assistance necessary to patent and introduce it to the public. A large part of the experiments were directed to reducing the cost of manufacture. I also desired, by actual experiment, to prove its adaptability to certain uses in the art; in short, to ascertain, as far as practicable with my limited means, the whole capacity of the invention. Although my invention, as an invention, was fully defined and completely demonstrated to my own mind, while in Cincinnati, at least as early as the year 1852, yet there were many things remaining to be done to make it commercially valuable and to make it useful for many different purposes for which I had designed and considered it adapted. It was necessary to carry on a series of experiments for very many of these independent uses, in order to obtain the proper consistency, the proper color, and other qualities suiting the material to such uses. While in Orange, I made a great many solid pieces of my plastic material, varying in size, shape, and color. * * * These results I gradually perfected after my return to Orange, and while there devoted myself constantly, excepting so far as my time was employed in a practice somewhat extensive among the poor, but very unremunerative, to perfect this invention. The cost of gun-cotton itself, as furnished in the market at that time, was too great to make the thing commercially practicable, and I spent a great deal of time in learning to make this necessary basic article more cheaply, so as to make the compound I wanted more practicable. This double work of my invention and practice was altogether beyond my strength, and my health gradually declined in consequence. A great deal of time was occupied in preparing specimens for the patent-office. I prepared more than 100 separate specimens for this purpose alone. These specimens were completed somewhere in the year 1860, but their preparation had occupied me much of my time for several years before. I filed a *caveat* referring to this invention in April, 1860, and made an application for letters patent in November, 1860. I made this application just as soon as I was pecuniarily able after I had commercially perfected my invention. The money for making the application I was compelled to borrow, having been in very straitened circumstances during the period when I was living in Orange, after my return from Cincinnati. During this period, and until I made application for letters patent, I find by examining my accounts that I collected on an average less than one dollar a day from my practice, and, of course, I was able to spare but little from this very limited income. During all that period I had but very little money, and such as I had was constantly devoted towards the perfecting and carrying out of my invention; and that was my main object and aim, during all that period, as it had been from the time when I first conceived the invention. Such practice of medicine as I did, I was compelled to do in order to obtain the necessary means of living, and for carrying on my experiments. After making this application for letters patent, my application was, as I believed, unjustly refused by the patent-office; and after having devoted so many years of my life to this one idea, the disappointment was too great for me to bear, enfeebled as I was by overwork; and, as I am informed by my friends, my mind became unbalanced in connection with a severe fit of sickness, which occurred at this time, and this condition continued for about seven months. I was sent to an asylum early in February, 1861, and remained there until some time in September, 1861. This sickness came upon me almost immediately after the rejection of my application by the patent-office."

He further states that after his release from the lunatic asylum he was compelled to desist from all mental labor; being advised by his physician that it would be very dangerous. He was also advised by him that the best chance of recovering his health would be to enter the navy and go to sea; that he obtained the position of assistant surgeon of the navy in August, 1862; that all the pay he received, beyond his living, was from time to time appropriated in the payment of the debts which he had contracted in prosecuting his invention; that as soon as his health permitted, he went home on leave of absence, and entered into a written contract with his former patent attorney, Mr. Greenough, to renew the application for the patent, agreeing to give him for his services one-half interest in any patent afterwards obtained; that Greenough having again failed in his efforts, a contract of a similar nature was made with Mr. Williams, through whose exertions the patent was finally granted.

No question has been raised by the defendants in reference to the truth of the patentee's testimony, and it clearly reveals the fact that his invention was practically complete some years before the date of sealing the English patent of Parkes.

2. I am further of the opinion that the defendants have not succeeded in showing any acts or conduct on the part of the patentee which would justify the court in holding that the invention was abandoned. Continued poverty, sickness, and mental alienation are always regarded as sufficient excuses for delay, and not a fact or circumstance has been brought into the case showing any intention of abandonment.

A decree must be entered for the complainant, with costs.